IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 16, 2026

**JACOB LEE CARNEY v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2020-CR-1024     William R. Goodman, III, Judge**

_____

**No. M2025-01775-CCA-R3-PC**

_____

Petitioner, Jacob Lee Carney, appeals the denial of his petition for post-conviction relief, arising from his guilty-pleaded convictions for first degree premeditated murder and attempted first degree premeditated murder, for which he received a life sentence.  On appeal, Petitioner argues that the post-conviction court erred in finding that he received the effective assistance of trial counsel and that his guilty plea was voluntarily and knowingly entered.  After review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Jacob Lee Carney.

Jonathan Skrmetti, Attorney General and Reporter; Michael J. Hurst, Qualified Law Student (Tenn. Sup. Ct. R. 7, § 10.03); Benjamin A. Ball, Senior Assistant Attorney General; Robert J. Nash, District Attorney General; and Michael Pugh, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

In October 2020, a Montgomery County grand jury indicted Petitioner for the first degree premeditated murder[1] of his grandmother, Mary Carney, and the attempted first

---

[1] "First degree murder is [a] premeditated and intentional killing of another[.]"  Tenn. Code Ann. § 39-13-202(a)(1).  "'Premeditation' means that the intent to kill must have been formed prior to the act itself," although it need not exist "for any definite period of time."  *Id*. § 39-13-202(e).

degree premeditated murder of his grandmother's fiancé, James Williard. At the time, Petitioner was seventeen years old. The State successfully moved to transfer the case from juvenile court to circuit court to prosecute Petitioner as an adult. After lengthy plea negotiations, Petitioner pleaded guilty as charged in exchange for a life sentence for the murder of his grandmother, to be served concurrently with a fifteen-year sentence for the attempted murder of Mr. Williard.

## I. The Plea Hearing

During the plea hearing, the State set forth the following facts as the basis for the plea. In the early morning hours of May 11, 2020, Mr. Williard was watching television in his bedroom while Ms. Carney slept by his side. Around 1:00 a.m., Mr. Williard heard noises coming from the kitchen. Knowing Petitioner was also in the home, Mr. Williard called out for him but received no reply. When Mr. Williard entered the kitchen, a light suddenly came on, and he encountered Petitioner standing there. Petitioner was dressed in black, wearing a mask and gloves, and holding a large knife. Petitioner held the knife "up at an angle just like he was ready to stab someone." Petitioner lunged at Mr. Williard, who was weak from a recent heart attack. The two wrestled for control of the knife, but Petitioner prevailed and began stabbing Mr. Williard in the back.

Ms. Carney awoke to the commotion and rushed to the kitchen. She restrained Petitioner long enough for Mr. Williard to break away. As Mr. Williard stood up, he slipped on the floor, which was soaked with his own blood. Ms. Carney slipped too. Petitioner began stabbing at their legs as they tried to kick him away. Petitioner then began stabbing at Ms. Carney's stomach. Ms. Carney initially was able to catch Petitioner's wrist before the blade reached her, and she urged Mr. Williard to call 911.

Thinking Ms. Carney had control over Petitioner, Mr. Williard rushed to the bedroom, but Petitioner wrestled free from Ms. Carney and chased after him. Once inside his bedroom, Mr. Williard locked the door and called 911. Petitioner attempted to kick down the bedroom door several times but was unsuccessful. He then returned his attention to Ms. Carney.

Police officers arrived within minutes and broke through the front door to gain entry to the home. Once inside, they discovered Mr. Williard in his bedroom—seriously injured but alive. The officers proceeded to Petitioner's bedroom, where they found him lying on his bed, his bloody clothing—including the mask and gloves—nearby. The officers also observed what appeared to be a knife wound to Petitioner's hand. In the den, the officers discovered the body of Ms. Carney, and she was pronounced dead at the scene. An autopsy later revealed that Ms. Carney had been stabbed 114 times.

During an interview with police, Petitioner admitted to the crimes in detail. He said he wore gloves to keep the blood off his hands. As he was stabbing Ms. Carney, the blade of the first knife broke. Petitioner said he retrieved a second knife and continued stabbing her. At the scene, officers discovered a broken knife lying next to Ms. Carney's body and a second, bloodied knife nearby. Mr. Williard indicated that the gloves Petitioner wore came from a pickup truck Mr. Williard had sold several weeks before—suggesting Petitioner secured the gloves well in advance of the attack.

The trial court advised Petitioner of his rights, including his right to proceed to trial, to testify in his own defense, and to be represented by counsel during trial. When asked whether there was anything "about the sentence, the agreement, or [his] rights" that he did not understand, Petitioner replied, "No," and he confirmed that he "fully under[stood] everything that [they had] gone over." When asked whether he was satisfied with trial counsel's representation, Petitioner replied, "Yes, sir." Petitioner then waived his rights and asked the court to accept his negotiated plea agreement, submitting a signed "Plea of Guilty and Waiver of Jury Trial and Appeal." The court accepted the plea agreement and sentenced Petitioner accordingly.

## II. Post-Conviction Proceedings

Six months after pleading guilty, Petitioner filed a pro se petition for post-conviction relief, claiming that he did not understand the nature and consequences of his guilty plea because his "mental state [was] not in the right place"; that his trial attorney ("Counsel") "pressure[d]" and "scared" him into pleading guilty; and that Counsel failed to present evidence of Petitioner's past allegations that Mr. Williard had physically and sexually abused him. The post-conviction court appointed counsel for Petitioner's post-conviction claims and conducted an evidentiary hearing. Petitioner and Counsel were the only two witnesses to testify at the hearing.

Petitioner testified that he met with Counsel more than five times but fewer than ten. He said that he understood the charges against him at the time of the plea. He also said he understood he could receive a lengthier sentence if he were successful in setting aside his plea.

Petitioner testified that he wished to set aside his plea because he "was just in a bad mental state [at the time]" and he "wasn't thinking properly." He explained that Counsel "kept putting in my head that I'm not going to win at trial or anything like that." He further explained that he felt Counsel "wasn't putting all the . . . circumstances in the court." Those circumstances included Petitioner's disclosure to a therapist that Mr. Williard had "molested [him]" when he was four years old and had "molested and beat [Petitioner] from that point forward." Petitioner said he believed Counsel could have presented evidence of

- 3 -

the molestation and abuse during trial. He acknowledged that Counsel followed up on the accusation by securing records from the Commonwealth of Virginia regarding the allegations. Although Petitioner claimed there was a video recording of the interview in which he made the allegations against Mr. Williard, Counsel later testified that no such recording existed. Petitioner denied that Counsel told him there was no recording of the interview.

Despite his misgivings about Counsel, Petitioner acknowledged that he chose to plead guilty. Petitioner said that the "main reason" he pleaded guilty was to "move on" and "research . . . [his] case and similar cases to see what [his] best chances [were]." Petitioner agreed that during the guilty plea hearing, the trial court asked whether he was satisfied with his attorney. He explained that he told the trial court he was satisfied only because the trial court had prevented him from firing Counsel on multiple occasions before the plea hearing. When asked to identify what Counsel did do that pressured Petitioner into pleading guilty, Petitioner replied, "I just wanted to work, and do a bunch of research, and try to get back into court, and fight it all by — by myself."

Petitioner acknowledged that he had been evaluated on three different occasions by three different mental health providers: once while his case was pending in juvenile court and twice after his case was transferred to circuit court. All three providers found Petitioner to be competent and not insane. Petitioner also acknowledged that he had e-mailed Counsel while in custody, asking her to negotiate a plea agreement. He testified that the plea negotiations with the State lasted several months.

Although Petitioner claimed that his statement to police had been coerced, he testified that he "was not sure on the exact definition of coercion." He agreed that he had been advised of his *Miranda* rights and that he freely chose to speak with police. He also agreed that Counsel reviewed the charges with him and that she explained the evidence against him. At the post-conviction hearing, Petitioner was asked, "Did somebody twist your arm, or strong-arm you, or force you to plead guilty?" He replied, "No."

Counsel testified that she had been a public defender for two years in Boston and then for eighteen years in Montgomery County. During that time, she practiced criminal law exclusively and handled between 7,000 and 8,000 cases, serving as lead counsel in at least thirty murder cases. She testified that she represented Petitioner over the course of three years, starting just after he was transferred from juvenile court. When asked how many times she met with Petitioner, she said "definitely more than 10 [times] . . . I'm sure I could count it up through jail records, but it was a lot."

Counsel testified that she communicated Petitioner's past allegations against Mr. Williard to all three mental health providers who conducted the evaluations. Once the

- 4 -

providers opined that Petitioner was competent, Counsel began discussing available options with Petitioner. She explained the evidence against him, the types of evidence that could be admitted, and the potential credibility issues that would arise with certain evidence. Counsel said that she advised Petitioner that his chances of an acquittal at trial were low. She advised him about the possibility of being convicted of a lesser charge at trial but also explained the dangers of consecutive sentencing. She explained that, because there were two victims, even if Petitioner were convicted on a lesser charge at trial, the overall sentence might be longer with consecutive sentencing than it would be with a negotiated concurrent sentence. Counsel acknowledged that in the midst of these discussions, the Tennessee Supreme Court released *State v. Booker*,[2] in which the court held that mandatory life sentences for juvenile offenders convicted of first degree murder violated the Eighth Amendment.

Counsel testified that she did not pressure Petitioner to plead guilty. She explained that telling Petitioner, "Look, you know, we can do it this way but we've got some problems, you know," is different from refusing to take his case to trial. She said that Petitioner "seemed fine," that they "discussed the guilty plea for quite some time," and that they submitted multiple counter-offers to the district attorney general. Regarding the suppression of Petitioner's statement to police, Counsel said that she considered filing a motion to suppress but did not think the issue had merit. She said Petitioner "insisted that it . . . be suppressed because he was a minor." But Counsel made clear that Petitioner's age was just one of the factors relevant to assessing the totality of the circumstances surrounding the statement. Counsel said that she watched the recording of the confession and that it appeared to be voluntary.

Counsel also testified about securing Petitioner's juvenile records from Virginia. She said she went to great lengths to secure those records, and once she reviewed them, it became clear that it was not Petitioner who made the allegations against Mr. Williard but rather Petitioner's mother. Further, Petitioner's mother made the allegations in the midst of a "contentious custody dispute" with Petitioner's father. Counsel testified that she was clear with Petitioner about her findings and "put [these findings] in writing to him." She advised Petitioner that it would be a better strategy to pause any investigation into the allegations against Mr. Williard for now and resume it later if the case went to trial. Petitioner insisted on moving forward and hired his own private investigator. Counsel said that Petitioner prevented her from communicating with the investigator.

Finally, Counsel testified that it was Petitioner who reached out to her via e-mail asking to negotiate the plea agreement. At first, Counsel proposed a plea to second degree murder, but the State refused. She advised Petitioner that his "best shot at . . . parole

---

[2] *State v. Booker*, 656 S.W.3d 49, 52 (Tenn. 2022).

eligibility" would be accepting the State's offer. She acknowledged that Petitioner would say one thing one day and then the next day "be like 'I don't know what I want to do.'" She said that Petitioner considered his options for roughly ten months as negotiations progressed. Petitioner sent an e-mail to Counsel that, in effect, asked, "Will the State just agree to this life sentence, with the possibility of parole, and move on?"

At the conclusion of the evidentiary hearing, the post-conviction court took the matter under advisement and issued a written order denying relief on November 5, 2025. In the order, the post-conviction court found that Counsel "fully explained the legal issues, and possible outcomes [to] Petitioner" and that Petitioner, "having received the benefit of his attorney's counsel and advice, voluntarily and knowingly accepted the offer of settlement." On each of Petitioner's claims, the court concluded that Petitioner failed to meet his burden of proof under Tennessee Code Annotated section 40-30-110(f). This appeal followed.

## Analysis

On appeal, Petitioner argues that Counsel failed to render effective assistance and that his guilty plea was involuntary and unknowing. He contends that Counsel "did not fully and properly consider the fact that one of the victims [Mr. Williard] had molested and physically abused [Petitioner] as a child." Petitioner further contends that "[a]t the time he entered his guilty plea, [he] was not in a good mental state." The State responds that Petitioner failed to meet his burden of proof with respect to any of his post-conviction claims. We agree with the State.

Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Both our state and federal constitutions guarantee the right to the effective assistance of counsel. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Similarly, a claim that a guilty plea "was not voluntarily and knowingly entered, implicates . . . due process . . . and therefore falls squarely within the ambit of issues appropriately addressed in a post-conviction proceeding." *Rigger v. State*, 341 S.W.3d 299, 308 (Tenn. Crim. App. 2010) (quoting *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000)); *see also Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969). Therefore, both the denial of effective assistance of counsel and an involuntary and unknowing guilty plea are cognizable claims under our Post-Conviction Procedure Act. *See Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022); *Rigger*, 341 S.W.3d at 308.

Claims for ineffective assistance of counsel and an involuntary and unknowing guilty plea both present mixed questions of law and fact, which we review de novo. *See*

- 6 -

*Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010). The post-conviction court's factual findings, credibility determinations, and the weight and value assigned to witness testimony are presumed correct unless the record preponderates against them. *Fields*, 40 S.W.3d at 458. The post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Id*.

## I. Ineffective Assistance of Counsel

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," and "the petitioner bears the burden of overcoming this presumption." *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation modified). To meet this burden, a petitioner must prove by clear and convincing evidence the facts underlying the ineffective assistance of counsel claim. Tenn. Code Ann. § 40-30-110(f). A petitioner must then show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 688, 693 (1984). In practice, a petitioner must prove "the fact of counsel's alleged error by clear and convincing evidence," and if that burden of proof is met, the court then must assess under *Strickland* whether that error constitutes ineffective assistance of counsel. *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009) (emphasis in original) (reconciling statutory burden of proof with *Strickland*).

To establish deficient performance, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 688. Thus, deficient performance is representation that falls below "an objective standard of reasonableness" as measured "under prevailing professional norms." *Id*. However, counsel has "wide latitude . . . in making tactical decisions." *Id*. at 689. A petitioner must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (citation modified). A reviewing court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690. Accordingly, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*.

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. When the issue is that "trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black*, 794 S.W.2d at 757. "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the

question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." *Id*. Failure to present such witnesses at the evidentiary hearing is a failure to show prejudice. *Id*. at 758.

As to Petitioner's argument that Counsel "did not fully and properly consider the fact that [Mr. Williard] had molested and physically abused [Petitioner] as a child," we agree with the post-conviction court that Petitioner failed to meet his burden of proof at the evidentiary hearing. *See* Tenn. Code Ann. § 40-30-110(f). Although Petitioner testified that he felt Counsel "wasn't putting all the . . . circumstances in the court," such testimony is insufficient to prove that Counsel failed to investigate. *See Dellinger*, 279 S.W.3d at 294. Petitioner admitted that Counsel obtained his records from Virginia and that Counsel communicated her findings to him. Counsel testified that the records she obtained revealed a different story from what Petitioner had told her. The post-conviction court credited Counsel's testimony over Petitioner's, and no other evidence was offered that Counsel failed to investigate Petitioner's past allegations against Mr. Williard. There was also no corroborating proof regarding Petitioner's allegations against Mr. Williard or how those allegations would have changed the course of the proceeding.

Even if we were to reach the merits of Petitioner's ineffective assistance of counsel claim, the record reflects that Counsel's performance did not fall below an "objective standard of reasonableness" as measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. Counsel represented Petitioner over three years. During that time, Counsel obtained records regarding Petitioner's allegations against Mr. Williard; communicated that information to the mental health providers evaluating Petitioner; and made a reasonable strategic decision not to further pursue these allegations. There is no evidence in the record about how Counsel's performance fell below prevailing professional norms, much less what those prevailing professional norms would have been.

Finally, Petitioner failed to show that "there [was] a reasonable probability that, but for Counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Although Petitioner indicated that he would have rather proceeded to trial, there was no evidence presented about what impact the allegations would have had on any subsequent trial nor any evidence about whether such allegations would have been admissible. Therefore, Petitioner is not entitled to relief.

II. Involuntary and Unknowing Guilty Plea

To satisfy due process, guilty pleas must be entered knowingly, intelligently, and voluntarily. *Boykin*, 395 U.S. at 243. In making this determination, the reviewing court must look at the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). Still, a petitioner's "solemn declarations in open court" that a

plea is voluntary and knowing create "a formidable barrier in any subsequent collateral proceeding" because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *Transou v. State*, No. W2022-00172-CCA-R3-PC, 2022 WL 8047703, at *9 (Tenn. Crim. App. Oct. 14, 2022). To succeed on any post-conviction claim, a petitioner must prove the facts underlying his claim by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f).

As to Petitioner's argument that his plea was involuntary because he "was not in a good mental state" and Counsel "pressured" him into pleading guilty—we again agree with the post-conviction court that Petitioner failed to meet his burden of proof at the evidentiary hearing. *See* Tenn. Code Ann. § 40-30-110(f). Here, Petitioner presented no evidence, other than his own testimony, about his state of mind leading up to the plea hearing. His testimony was contradictory or limited to conclusory statements that he "was just in a bad mental state [at the time]" and "wasn't thinking properly." Petitioner unambiguously testified at the post-conviction hearing that no one "twist[ed] [his] arm, or strong-arm[ed] [him], or force[d] [him] to plead guilty." Without more, Petitioner has failed to prove the facts of his claim by clear and convincing evidence.

These statements cannot overcome Petitioner's "solemn declarations in open court" that his plea was voluntary and knowing. *Blackledge*, 431 U.S. at 74. Indeed, Petitioner's declarations at the plea hearing—including his approval of Counsel's representation and his affirmation that he "fully under[stood]" the plea agreement—"carry a strong presumption of verity" and create a "formidable barrier in any subsequent collateral proceeding." *Id*. On these facts, Petitioner is not entitled to relief.

## Conclusion

For the foregoing reasons, we affirm the judgment of the post-conviction court.


s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE